NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2006-1442

FRANKLIN ELECTRIC CO., INC.,

Plaintiff-Appellant,

v.

DOVER CORPORATION
(doing business as OPW Fueling Components),

Defendant-Appellee.

Thomas I. Ross, Marshall, Gerstein & Borun LLP, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief were Thomas K. Stine and Rashmi V. Gupta.

John C. Scheller, Michael Best & Friedrich, LLP, of Madison, Wisconsin, argued for defendant-appellee. With him on the brief were James R. Troupis and Frances M. Haas.

Appealed from: United States District Court for the Western District of Wisconsin

Judge John C. Shabaz

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2006-1442

FRANKLIN ELECTRIC CO., INC.,

Plaintiff-Appellant,

v.

DOVER CORPORATION
(doing business as OPW Fueling Components),

Defendant-Appellee.

———————————————

DECIDED:  March 1, 2007

———————————————

Before MAYER, <u>Circuit Judge</u>, CLEVENGER, <u>Senior Circuit Judge</u>, and LINN, <u>Circuit Judge</u>.

CLEVENGER, <u>Senior Circuit Judge</u>.

Plaintiff Franklin Electric Co., Inc. ("Franklin") appeals the May 4, 2006 order of the United States District Court for the Western District of Wisconsin granting a motion for summary judgment of noninfringement of U.S. Patent No. 5,085,257 ("the '257 patent") filed by defendant Dover Corp. d/b/a OPW Fueling Components ("OPW").  We <u>reverse</u> and <u>remand</u>.

I

A "sump" is an underground container which provides easy access to underground components, such as the fill and evacuation pipes of an underground fuel tank, via a removable cover or lid situated essentially flush with ground level.  In

addition to providing easy component access, a well-sealed "containment sump" (or "containment manhole") can also provide protection against environmental contamination during the filling and evacuation process. For example, U.S. Patent No. 4,763,806 ("the '806 patent" or "the Podgers patent") provides the following containment manhole, which is anchored in concrete, '806 patent col.5 ll.22-30, and which provides access to the fill pipe via a removable lid 21.



Id. fig.3. As shown in the depiction above, the Podgers patent provides a drain 29 that allows any spilled fuel to flow back into the fill pipe from the bottom of the containment sump (manhole), and thereby protects against environmental contamination due to leakage. Id. col.5 l.60 – col.6 l.12.

A

The invention of the '257 patent, entitled "Sump Cover Containment Assembly," also relates to protection against environmental contamination due to leakage. Unlike the Podgers patent, however, the '257 patent provides a spill collector entirely separate

from the containment sump itself.  As shown in the depiction below, the spill collector 55 is housed within a larger assembly that sits on top of the containment sump 11:



'257 patent, fig. 7.  The bottom of this larger assembly is a sump shield 16 which fits over the containment sump and provides access to the containment sump through upward extensions 19 defining a set of holes in the shield.  The top of the assembly is a sump cover 13 which is supported by a frame 18 and which also has downward extensions 51 defining a set of holes corresponding to the set of holes in the sump shield.  When assembled as shown (right side only), the upward and downward extensions surround the spill collector and form a continuous, top-to-bottom hole above the fill pipe.

The spill collector—although discussed in the specification and depicted in the figures submitted with the application to the patent office—was not a limitation of the original application claims.  The examiner rejected claim 1 (and all of the claims depending therefrom) as obvious in light of the Podgers patent in combination with a number of other prior art references.  The inventor responded to the examiner's

rejection by submitting an amended version of claim 1 having, among other things, a

spill collector limitation. Accompanying these amendments were the following remarks:

> Claims 1-7 were further rejected under 35 USC 103 as unpatentable over Podgers et al[.] in view of Milo and Petter et al. Claim 1 has been amended to include further clarifying and limiting language which clearly distinguishes claim 1 as amended from the prior art of record. More specifically, claim 1 now includes clarification of the sump cover as accepting a spill collector in one of its downward extensions, as well as clarification of the sump shield as substantially covering the top end of the containment sump while accepting a spill collector in one of its upward extensions. Claim 1 as amended does not teach the containment manhole of Podgers or the devices of Milo and/or Petter, but rather a containment assembly which substantially eliminates the spills which continued to occur with the small containment or spill collectors. It does so by mating to the containment sump which is utilized with underground gas tanks. Thus, when the spill collectors of the patents to Podgers, Petter, Milo, Sharp or LeBlanc fail because someone was a bit careless or when the pipe connecting the spill collector and the gas tank fails, the sump cover containment assembly of the present invention prevents intrusion into the surrounding soil. Thus, the invention of amended claim 1 is capable of much more than is the prior art of record. It acts as a housing for containing and supporting a spill collector, as well as acting as a secondary containment system which facilitates access for maintaining a spill collector utilized therewith. Thus, the spill collector no longer needs to be concreted into the ground as was previously required.

JA 368-69.

After further amendments not relevant here, claim 1 was allowed in the following

form:

> 1. A sump cover containment assembly for use with a containment sump which has a top end with a hole therein, comprising:
>
> a substantially hollow frame having an open top end and an open bottom end sized, shaped and oriented so that said bottom end fits around said top end of said containment sump;
>
> a sump cover positionable over said top end of said frame, having at least one downward extension and at least one access hole extending through said at least one downward extension, said at least one access hole being of proper size, shape and orientation to facilitate positioning of a spill collector therein;

a lid for covering each of said at least one access holes in said sump cover;

first sealing means for sealing said lid to said sump cover;

second sealing means for sealing said sump cover to said frame to minimize intrusion of surface water into said substantially hollow frame, and

a sump shield substantially covering said top end of said containment sump, having a downward lip which extends downward about said containment sump between said frame and said containment sump, and an upward extension having a hole therein sized, shaped and oriented to mate with said at least one downward extension of said sump cover and to facilitate positioning of said spill collector therein.

'257 patent col.6 ll.1-30.

B

The accused device is OPW's Multi-Port Manhole Water Shroud System Option ("MPWS"), which is an assembly similar to the assembly claimed in the '257 patent in the sense that the MPWS also has a spill collector 55a housed within a larger assembly on top of, and entirely separate from, the containment sump 11a itself:



The above depiction shows that the bottom of the MPWS assembly is a sump shield 16a which fits over the containment sump and which provides access to the containment sump through upward extensions 19a defining a set of holes in the shield. And like the claimed '257 assembly, the top of the MPWS assembly is a sump cover 13a which is supported by a frame 18a and which has two-piece downward extensions—water shroud boots 51b attached to metal rings 51a[1] bolted to the cover 13a—defining a set of holes corresponding to the set of holes in the sump shield. See JA at 491-92. When assembled as shown, the upward and downward extensions surround the spill collectors and form continuous, top-to-bottom holes above the pipes 56a.

II

In the proceedings below, a primary dispute between the parties was the proper construction of "facilitate positioning" in claim 1. OPW argued that the term means to "assist in positioning and support," JA at 96, whereas Franklin argued that it "means only that the opening be large enough to 'allow' a spill collector to be positioned in the hole," JA at 20. The district court, after noting that "the ordinary meaning of the word 'facilitate' is to make easier or to assist," began its analysis by looking to the language of

---

[1] The left and right sides of the accused device are essentially mirror images of each other. As such, the MPWS depiction shown above contains several pairs of duplicate labels, each pair consisting of one label associated with a left-side element and another identical label associated with the corresponding right-side component. The label "51a" is an exception because it is associated with the metal ring at the top of the water shroud boot on the left side, but associated with the water shroud boot itself on the right side. We suspect that this latter association is a typographical error and that the label "51a" on the right side should read "51b." See JA at 492 ("The MPWS uses two hollow downward extension pieces—a rigid, heavy metal ring (51a) and a soft, pliable water shroud boot (51b).").

the claim itself for guidance. <u>Franklin Electric Co., Inc. v. Dover Corp.</u>, No. 05-598, slip op. at 17 (W.D. Wisc. May 4, 2006) ("<u>SJ Decision</u>"). In so doing, the court observed that the upward and downward extensions must mate to form "at least one access hole being of proper size, shape and orientation to facilitate positioning of a spill collector therein." <u>Id.</u>, slip op. at 17-18; <u>see also</u> '257 patent col.6 ll.9-14, col.6 ll.22-30. Based on that observation, the court inferred an "intent by the inventor that the internal surface of the downward extension assist in positioning the spill collector," <u>SJ Decision</u>, slip op. at 17, and that "the opening formed by the mated extensions play a role in positioning the spill collector," <u>id.</u>, slip op. at 18.

The district court sought additional guidance by looking to the figures and the specification. Most persuasive to the court was "the only depicted embodiment," Figure 7 (reproduced above), "which . . . illustrates that the spill collector is inserted into the space formed by the mated extensions where it contacts and is held in position by both the upward and downward extensions." <u>Id.</u> The court found this to be consistent with both "the claim requirement that both extensions facilitate positioning," as well as "[t]he related specification language . . . specifying an o-ring to form a seal where the spill collector contacts the downward extension." <u>Id.</u>; <u>see also</u> '257 patent col.4 ll.61-68, col.5 ll.15-19. The court also looked to the inventor's use of "similar language to mean the same thing in a different context . . . in describing the relationship between the sump and the sump shield which rests on it: 'Such positioning allows frame 18 to overlap extension 17 of containment sump 11 and <u>facilitates proper positioning</u> of sump shield 16 to effectively eliminate water intrusion into containment sump 11.'" <u>SJ Decision</u>, slip op. at 18-19 (quoting '257 patent col.5 ll.30-32) (emphasis added by district court). This

further confirmed the court's construction because, "[a]s illustrated by figure 7 to which the language refers, 'positioning' is 'facilitated' by physical contact between the frame, sump and shield in identical manner to the way positioning is facilitated by physical contact between the upward extension, downward extension and spill collector." SJ Decision, slip op. at 19.

As a final step in its claim construction analysis, the district court reviewed the prosecution history. Here, too, the court found confirmation of its construction in the inventor's comments accompanying his amendment to overcome the examiner's obviousness rejection. The court reasoned that "[t]he argument in support of allowance that the containment assembly 'acts as a housing for containing and supporting a spill collector' which would eliminate the prior art need that the collector 'be concreted into the ground' leaves no doubt that the ['facilitate positioning'] limitation was intended to require physical communication between the spill collector and the extensions and that contact between the extensions and the spill collector was a basis on which the device was distinguished from the prior art in order to obtain allowance from the examiner." Id. (quoting JA at 369). Thus, the district court rejected Franklin's proposed construction in favor of the construction proposed by OPW.

The court then proceeded to explain that, based upon its construction of "facilitate positioning," summary judgment of noninfringement was appropriate:

> There is no question that the claim element requiring the upward and downward extensions to "facilitate positioning" of the spill collector is absent from the accused product. The optional water shroud boot of defendant's containment system is the structure analogous to the mated upward and downward extensions of claim 1. [n.2: the Court makes no finding concerning whether the water shroud boot embodies these additional elements.] However, the water shroud boot plays absolutely no role in positioning the spill collector. The water shroud boot is optional

and need not be present on the device. When it is included in defendant's containment system it is added only after the spill collector has been fully positioned and installed. It is soft and pliable and does not come into contact with the spill collector. There is no reasonable sense in which the water shroud boot could be said to assist in the positioning of a spill collector. Its presence or absence is irrelevant to the positioning of a spill collector. Because defendant's device lacks this element of the only independent claim of the '257 patent its accused containment system does not infringe and it is entitled to summary judgment.

SJ Decision, slip op. at 20-21 (footnote in original). Accordingly, OPW's motion for summary judgment was granted, and final judgment was entered against Franklin. Franklin subsequently appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

III

"We review the district court's claim construction and the grant of summary judgment based thereon without deference." Novartis Pharm. Corp. v. Eon Labs Mfg., 363 F.3d 1306, 1308 (Fed. Cir. 2004). "Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Honeywell Int'l, Inc. v. ITT Indus., 452 F.3d 1312, 1317 (Fed. Cir. 2006) (citing Fed. R. Civ. P. 56(c)). "'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Honeywell, 452 F.3d at 1317 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

IV

We read the district court's claim construction of "facilitate positioning" to impose two requirements: (1) both extensions must physically contact the spill collector, and (2) the upward and downward extensions must assist in the act of positioning the spill collector. As to the first requirement, OPW conceded at oral argument, and we agree,

that nothing in the language of claim 1 requires physical contact between the extensions and the spill collector. See Digital audio recording: Oral Argument in Case No. 2006-1442, at 16:30 (Feb. 8, 2007) ("Oral Argument").[2]  Likewise, we find no such requirement in the specification.  To be sure, some uses of the word "facilitate" in the specification lend arguable support to OPW's position.  In the two uses identified by the district court, the phrase "facilitate[s] proper positioning" arises in the context of creating a tight seal between certain parts of the assembly.  '257 patent col.4 ll.24-26, col.5 ll.30-34.  And, as the district court also pointed out, the specification twice discusses the formation of a seal via contact between the downward extension and the spill collector. Id. col.4 ll.65-68, col.5 ll.15-19.  It is therefore clear from these examples that the "facilitate positioning" language of claim 1 does not preclude physical contact between the extensions and the spill collector.

It does not necessarily follow, however, that the term "facilitate positioning" requires physical contact.  In fact, the specification uses the term "facilitate" in several ways to describe interactions in which physical contact is unnecessary.  For example, the specification provides that the "[s]ump cover 13 may include one or more lids 14 and 15 to facilitate entry into containment sump 11."  '257 patent col.2 ll.64-66 (emphasis added).  In no sense does entry into the containment sump through an uncovered hole in the sump cover require physical contact with the lid; once the lid is open, entry is continuously facilitated with no contact whatsoever.  Similarly, the specification explains in another section that "one or more upward extensions 19 and/or 21 may be provided to facilitate access for filling and/or evacuation of pipes or instrumentation."  Id. col.3

_____

[2]        http://www.cafc.uscourts.gov/oralarguments/mp3/06-1442.mp3

ll.21-24 (emphasis added). Again, the hole defined by the upward extensions continuously facilitates access without any contact. In yet another example from the specification, it is stated that:

> Hole 25 is provided in sump cover 13 to <u>facilitate</u> insertion of threaded section 28 of bolt 90 therethrough. Hole 25 may include a counter sink 41 to <u>facilitate</u> use of a bolt 90 with a counter sink-type head 42, as shown in FIG. 5, or may include a counter sink 48 as shown in FIG. 6 to <u>facilitate</u> use of a bolt 90 having a hex head 29 as shown.

'257 patent col.4 ll.4-10 (emphasis added). As before, neither holes nor counter sinks require physical contact in order to "facilitate" their associated tasks. In the case of a tapered counter sink-type head, while physical contact between the head and the contours of the counter sink is likely preferred, that possibility does not mean physical contact is an absolute necessity for the counter sink to "facilitate use" of such a bolt. Indeed, in the case of a hex-headed bolt, physical contact between the head and the contours of the counter sink is likely undesirable if there is a need to accommodate a wrench around the head.

Perhaps the most notable aspect of the specification is that although it contemplates contact between the downward extension and the spill collector, there is no mention of contact between the upward extension and the spill collector. Admittedly, figure 7 appears to depict contact between the right side of the spill collector and the upward extension. Yet, a close examination of figure 7 also reveals that any such contact might be incidental because, on the opposite side of the spill collector, there is a small but distinctive space between the upward extension and the spill collector. The only arguable contact in that portion of the figure is provided by an ambiguous line extending from the top of the upward extension to the side of the spill collector. That

line might have been intended to indicate a connection, it might have been accidental, or it might have been intended to indicate something else altogether.

We need not resolve the ambiguity here because patent figures are generally not intended to convey such detail. Cf. Hockerson-Halberstadt, Inc. v. Avia Group Int'l, 222 F.3d 951, 956 (Fed. Cir. 2000) ("Under our precedent . . . it is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue."). Moreover, even if figure 7 unambiguously depicted contact between the upward extension and the left side of the spill collector, as it seems to depict between the upward extension and the right side of the spill collector, we would not necessarily conclude that such contact is a required limitation of the claims because figure 7 is merely a preferred embodiment of the invention. '257 patent col.5 ll.42-48. See Burke, Inc. v. Bruno Indep. Living Aids, Inc., 183 F.3d 1334, 1341 (Fed. Cir. 1999) ("[A]n attribute of the preferred embodiment cannot be read into the claim as a limitation."). Put simply, any contact inferable from figure 7 is not relevant to our claim construction analysis. Accordingly, we find nothing in the specification indicating that the term "facilitate positioning" requires physical contact.

At oral argument, counsel for OPW stated that the inventor's remarks during prosecution in response to the examiner's obviousness rejection provide the best support for his client's position. Oral Argument, at 18:05. In particular, counsel concentrated heavily on the following passage:

> [W]hen the pipe connecting the spill collector and the gas tank fails, the sump cover containment assembly of the present invention prevents intrusion into the surrounding soil. Thus, the invention of amended claim 1 is capable of much more than is the prior art of record. It acts as a

> housing for containing and supporting a spill collector, as well as acting as a secondary containment system which facilitates access for maintaining a spill collector utilized therewith. Thus, the spill collector no longer needs to be concreted into the ground as was previously required.

JA at 369 (emphasis added). According to counsel, because the amendment related to the interplay between the extensions and the spill collector, the word "It" must refer to the upward and downward extensions. And since "It" serves "as a housing for containing and supporting a spill collector," OPW argues that the inventor explicitly disclaimed any apparatus in which the upward and downward extensions (i.e., "It") do not provide such housing and support.

We find this argument unpersuasive. The word "It" plainly refers to "the invention of amended claim 1," see JA at 369 (emphasis added), and therefore encompasses the entire claimed assembly; "It" does not refer to the upward and downward extensions alone. At most, the inventor disclaimed any apparatus in which the spill collector is not supported by something within the assembly. However, there is no requirement that the support be provided by physical contact with both the upward and downward extensions. The mere fact that the preferred embodiment depicted in figure 7 shows physical contact between the spill collector and the downward extension does not mean that such contact is a claim limitation, see Burke, 183 F.3d at 1341, and it certainly does not mean that contact between the spill collector and the upward extension is a claim limitation.

Counsel for OPW also contended that we should infer physical contact from the inventor's statement that "the sump cover containment assembly of the present invention prevents intrusion into the surrounding soil" "when the pipe connecting the spill collector and the gas tank fails." JA at 369. Although we do not fully understand

2006-1442                                 13

the argument, counsel seemed to be saying that there must be physical contact in order to prevent the spill collector from becoming displaced in the event that the pipe below breaks. If that is in fact the argument that was being made, then it amounts to nothing more than a restatement of the argument rejected above that only physical contact with both extensions can be the source of support for the spill collector. Just as it might be the case that the upward extension could add nesting support for a tapered spill collector, it might also be the case that a sufficiently tight o-ring seal between the spill collector and the downward extension could render such additional nesting support unnecessary. Therefore, we reject the physical contact limitation imported into the claim by the district court.

As to the second requirement of the district court's construction—that the upward and downward extensions must assist in the act of positioning the spill collector—we note that claim 1 is an apparatus claim, and as such, it contains no "positioning" step with which the extensions might assist. Consequently, it does not matter when a space is created to house the spill collector; a structure can still infringe claim 1 if the space only exists after the full device is constructed. Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd., 401 F.3d 1367, 1375 (Fed. Cir. 2005). While it may be true that an apparatus claim could recite a limitation merely capable of assisting with an anticipated assembly process, we discern no indication from the portions of the intrinsic record before us that the inventor intended to provide the extensions as a means of overcoming some difficulty in the prior art with the act of positioning the spill collector. Rather, the comments submitted in response to the examiner's rejection reveal that the inventor was principally concerned with providing a secondary housing for the spill

collector separate from the containment sump itself. See JA at 369 ("Thus, the invention of amended claim 1 is capable of much more than is the prior art of record. It acts as a housing for containing and supporting a spill collector, as well as acting as a secondary containment system which facilitates access for maintaining a spill collector utilized therewith."). Therefore, we hold that the extensions need not assist with, or even be capable of assisting with, the act of positioning the spill collector. Instead, we agree with Franklin that the upward and downward extensions need only "allow" the spill collector to be positioned in the hole.

OPW argues that even if we hold—as we do—that Franklin's proposed construction of "facilitate positioning" is correct, summary judgment of noninfringement is still appropriate because the water shroud boot of the accused device, which is only optionally installed after the proper placement of the spill collector, "plays no role whatsoever in positioning" the spill collector. Appellee's Br. at 36. For the sake of clarity, we repeat our holding announced above that the extensions need not assist with, or even be capable of assisting with, the act of positioning the spill collector. A necessary corollary to this holding is that a proper infringement analysis requires a comparison of the limitations of the claims to the accused device, regardless of what process was used to assemble the device.

V

For the reasons stated, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.