*1360 DYK, Circuit Judge,
dissenting.
I respectfully disagree with the majority’s construction of the term “mean grain diameter dB0,” which is included as a limitation of the asserted claims in the five patents at issue here — patents which the majority designates the “Particle Size Patents.” [1]
In my view, the International Trade Commission (“ITC”) reached the correct claim construction. Accordingly, I would affirm the ITC’s holding, based on its claim construction, that the “Normal Series” products of the accused infringer, Dominant Semiconductors Sdn. Bhd. (“Dominant”), do not infringe the Particle Size Patents. I also would affirm the ITC’s holding, based on its claim construction, that appellants (collectively “OS-RAM”) do not practice the Particle Size Patents in their domestic operations and therefore have failed to make the showing required by the domestic industry prong of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.
The Particle Size Patents relate to the use of a phosphor powder in a light-emitting diode (“LED”) to transform some light emitted by the LED from one wavelength to another to give the appearance that the LED emits white light. Relatively small phosphor grains absorb light of one wavelength and emit and scatter light of a different, complementary wavelength to produce the appearance of white light. Larger particles, however, are detrimental to the invention. They do not function in the same way as smaller particles to absorb and emit light and are not as effective at scattering light to produce a uniform color and intensity. Larger particles also cause problems related to uneven sedimentation during the manufacturing process.
As the majority recognizes, Maj. Op. at 1355-56, there are two possible methods to calculate the “mean grain diameter dB0” of a pigment powder. The first is an average diameter by number of particles, and the second is an average diameter by volume. Neither the claims nor the specifications of any of the Particle Size Patents state which of the two methods is to be used.
Contrary to the majority’s assertion, the expert witness testimony did not reflect “full and emphatic agreement that the ordinary meaning of the average diameter of the[] particles is the number-based average.” Maj. Op. at 1356. Rather, the record indicates that both methods were used in the industry for differing purposes. When phosphor powders were sold, including by OSRAM, the particle size was measured as an average diameter by volume. J.A. at 3404, 4318-19, 4330. When conducting research and development of new products, researchers employed a number-based average to measure particle size. J.A. at 4330. Despite the majority’s suggestion that Dominant’s expert witness changed his testimony on this point, there is in fact no conflicting testimony. Indeed, OSRAM’s employee and expert, Dr. Za-chau, testified that the volume-based average particle diameter is used commercially in the sale of phosphor powders, while the numerical average diameter is used for research and development purposes. Id. He explained that the measurement required to compute the average diameter by volume is “an easy, fast, an [sic] inexpensive measurement,” but that a numeri *1361 cal average diameter must be calculated from less efficient measurements that require the use of a scanning electron microscope. Id. The central issue here is whether the “mean grain diameter d50” should be defined from the perspective of commercial sales or research and development.
In my view, the ITC was correct to choose the commercial sales definition— that is, an average by volume — as the correct construction of the “mean grain diameter d50.” The specifications here make it quite clear that a commercial invention is being described. See, e.g., J.A. at 114 (describing, as an object of the invention, to “enable[ ] mass production at reasonable engineering effort and expense and with maximally replicable component characteristics”). There was objective evidence of the widespread commercial use of this calculation method, and undisputed evidence that the measurements required are relatively cheap and efficient, as would be required for commercial use. Those who secure patents typically are describing devices and methods designed for commercial use, rather than devices designed only for research. It follows, I believe, that the patent should be interpreted to utilize this commercial measurement rather than the research measurement.
The ITC also properly relied on two technical treatises, the Phosphor Handbook and Perry’s Chemical Engineers Handbook. See Phillips v. AWH Corp., 415 F.3d 1303, 1318 (Fed.Cir.2005) (en banc) (noting usefulness of technical treatises in construing claims). While those treatises do not define the term “mean grain diameter,” the ITC concluded that both “indicate that the weight basis is more often used to describe real powders than other bases.” J.A. at 48. Weight- and volume-based average particle diameters are essentially equivalent because they are related based on a known constant, the particles’ density. The commercial sales literature and the technical treatises both constitute particularly strong sources of extrinsic evidence under the circumstances of this case because they provide objective, contemporaneous, unbiased, and publicly available descriptions of how mean particle size was measured by those skilled in the art. See Phillips, 415 F.3d at 1322 (describing proper use of contemporaneous extrinsic evidence, especially evidence from an “unbiased source ‘accessible to the public in advance of litigation’ ” (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1585 (Fed.Cir.1996))).
The majority reasons that the purposes of the invention described in the Particle Size Patents are better served by a numerical average, because the majority assumes that the disputed claim language sought to emphasize the prevalence of small particles rather than the absence of large particles.[2] The difference between an average *1362 diameter based on the number of particles and an average diameter based on volume is that the former tends to emphasize the presence of many useful small particles, while the latter gives greater emphasis to the presence (or absence) of any larger, undesirable particles. The majority’s conclusion that the concern was with the number of small particles is unsupported by any language in the claims or specifications of the Particle Size Patents, and in my view is entirely speculative. In other words, there is no intrinsic evidence to suggest that the patents sought to emphasize the presence of many useful small particles, rather than the relative absence of larger, harmful particles. Under these circumstances, it is just as likely that the disputed claim language sought to emphasize the absence of larger particles. One of OSRAM’s experts explained that in the process of invention, larger particles proved harmful to both the manufacturing process and the function of the final product, and that OSRAM obtained better results by using smaller particles. J.A. at 5041^3.
The majority’s contention that a claim limitation necessarily seeks to “state the parameters of the products that work in the desired way,” rather than specifying in the negative parameters that have proven detrimental, Maj. Op. at 1358 (citing Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd., 401 F.3d 1367, 1372 (Fed.Cir.2005)), is unsupported as a matter of law and contrary to common sense. This court’s opinion in Howmedica did not discuss whether claim limitations properly are interpreted as describing either virtuous qualities or the avoidance of undesirable qualities. In Howmedica, there were two possible methods to measure the “transverse sectional dimensions” of a stem part designed to secure a prosthetic limb to a bone socket. 401 F.3d at 1371. This court reasoned that the method relying on two-dimensional surface area was the appropriate construction because in several places the specification indicated the need for the stem part to fit closely into the bone socket, and the two-dimensional surface area method would produce a more exact fit than the other method. Id. at 1372. Thus, while the two-dimensional surface area measurement method in Howmedica was directed to specifying a parameter with useful effects, there was no indication that the rejected method sought to avoid a parameter with detrimental effects.
Here a different situation prevails, and the purposes of the invention could be served either by utilizing the volume-based or the number-based measurement. Under these circumstances, the objectives of the invention do not answer the claim construction question, and resort to the commercial standard of a volume-based average is appropriate. I dissent from the majority’s refusal to sustain the ITC’s adoption of the commercial standard.

. The disputed language is present in each of the claims of the Particle Size Patents that appellants assert were infringed: claims 1, 3, 6-7, and 10-13 of Patent No. 6,066,861; claims 1-2, 6-7, 11-12, and 14-15 of Patent No. 6,277,301; claims 1, 3, 6-7, 10-15, 17, and 20-21 of Patent No. 6,613,247; claims 1, 3, 6-7, 10-13, and 15 of Patent No. 6,245,259; and claims 2-5, 7, and 10 of Patent No. 6,592,780.

. The majority also relies on the fact that OSRAM’s own products do not fall within the claim limitation when measured by a volume-based average particle size. Maj. Op. at -. In relying on this court’s opinion in Hoechst Celanese Corp. v. BP Chemicals, 78 F.3d 1575, 1581 (Fed.Cir.1996), however, the majority mistakenly equates OSRAM's products with the preferred embodiment of the patent. See Int’l Visual Corp. v. Crown Metal Co., 991 F.2d 768, 771-72 (Fed.Cir.1993) (reversing claim construction based on commercial embodiment because " '[¡Infringement is determined on the basis of the claims, not on the basis of a comparison with the patentee's commercial embodiment of the claimed invention.' " (quoting ACS Hosp. Sys., Inc. v. Montefiore Hosp., 732 F.2d 1572, 1578 (Fed.Cir.1984))); see also SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1339 (Fed.Cir.2005) (rejecting claim interpretation based on commercial embodiment of invention). At oral argument, OSRAM was unable to identify any record evidence establishing that its products were designed to practice *1362 the Particle Size Patents or that the preferred embodiments under the patents would not be within the claim limitation if the average par-tide size were measured as a volume-based mean.