# United States Court of Appeals for the Federal Circuit

2008-1358

ERBE ELEKTROMEDIZIN GMBH
and ERBE USA, INC.,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee.

and

CANADY TECHNOLOGY, LLC
and CANADY TECHNOLOGY GERMANY GMBH,

Intervenors.


Philip G. Hampton, II, Dickstein Shapiro LLP, of Washington, DC, argued for appellants. With him on the brief was Steven M. War.

Jonathan J. Engler, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for appellee. With him on the brief were James M. Lyons, General Counsel, and Andrea C. Casson, Assistant General Counsel.

Timothy R. DeWitt, 24IP Law Group USA, PLLC, of Annapolis, Maryland, argued for intervenor.

Appealed from: United States International Trade Commission

# United States Court of Appeals for the Federal Circuit

2008-1358

ERBE ELEKTROMEDIZIN GMBH
and ERBE USA, INC.,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

CANADY TECHNOLOGY, LLC
and CANADY TECHNOLOGY GERMANY GMBH,

Intervenors.

On appeal from the United States International Trade Commission in
Investigation No. 337-TA-569.

_____

DECIDED: May 19, 2009

_____

Before MICHEL, Chief Judge, RADER and DYK, Circuit Judges.

DYK, Circuit Judge.

ERBE Elektromedizin GmbH and ERBE USA, Inc. (collectively "ERBE")
commenced proceedings before the International Trade Commission ("ITC") under
section 337 of the Tariff Act of 1930 alleging that Canady Technology, LLC and Canady
Technology Germany GmbH (collectively "Canady") engaged in contributory and

induced infringement of claims 1, 3, 4, 11, 13, 35, 37, 38, 39, and 41 of U.S. Patent No. 5,720,745 ("'745 Patent"). These claims are drawn to an electrosurgical device and method of coagulating tissue using an endoscope with a plurality of "working channels." We hold that the ITC correctly construed "working channel" and correctly found that ERBE presented no evidence of direct infringement of the asserted claims by Canady's customers. Thus, Canady could not have engaged in contributory or induced infringement of the asserted claims. We affirm.

## BACKGROUND

ERBE is the assignee of the '745 Patent. This patent relates to electrosurgery by argon plasma coagulation ("APC"), which is a coagulation method in which high-frequency current is conducted to tissue via ionized argon (argon plasma). APC is a minimally-invasive surgical procedure that stops bleeding in tissue, such as within the gastrointestinal or tracheobronchial tract. During the procedure, a flexible probe is positioned within a "working channel" in an endoscope such that a portion of the probe protrudes beyond the distal end of the endoscope. The probe has an electrode located within its distal end (i.e., tip) for ionizing the inert argon gas which is flowing past the electrode. The ionized argon causes an "eschar" (i.e., scab) to form over bleeding tissue; the formation of an eschar stops the bleeding. In addition to a channel for the probe, a second "working channel" may be used for a manipulator so that the tip of the probe "can be aligned to the tissue to be coagulated," although a manipulator is not always necessary for the procedure. '745 Patent col.2 ll.55–60. In order to conduct the procedure, an operator of the endoscope must be able to view the area to be treated

using optics (either fixed or movable) within the endoscope so that the operator knows when the tip of the probe is near an area of bleeding tissue.

ERBE and Canady compete in selling APC probes. ERBE alleged that Canady's importation and sale of its probes constituted contributory infringement and induced infringement. ERBE essentially asserted that Canady sold its probes to hospitals knowing that these hospitals combined the probes with endoscopes, and that the use of the combined probes and endoscopes directly infringed the asserted claims of the '745 Patent.

ERBE initiated a proceeding before the ITC under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, seeking a limited exclusion order banning importation of Canady's endoscopic probes for uses which infringe claims 1, 3, 4, 11, 13, 35, 37, 38, 39, and 41 of the '745 Patent.[1] In addition to alleging contributory and induced infringement, ERBE alleged the existence of a domestic industry.[2]

Claims 3, 4, 11, and 13 depend from independent claim 1, which states:

1. An electrosurgical unit for achieving coagulation of tissue, comprising:
    an endoscope having:
        a proximal end and an opposing distal end, and

---

[1] There is a related consolidated appeal pending before this court from the U.S. District Court for the Western District of Pennsylvania. ERBE Elektromedizin GmbH v. Canady Tech. LLC, 529 F. Supp. 2d 577 (W.D. Pa. 2007), appeal docketed, Nos. 2008-1425, 2008-1426 (Fed. Cir. June 24, 2008). In that suit, ERBE and ConMed Corporation sued Canady Technology, LLC and Dr. Jerome Canady (individually) for, inter alia, infringement of the '745 Patent. Various counterclaims were involved. An appeal and cross-appeal were filed from the district court's judgment. ERBE Elektromedizin GmbH v. Canady Tech. LLC, Nos. 2008-1425, 2008-1426. We have stayed that appeal due to the bankruptcy proceedings of Dr. Canady (individually).

[2] A patent-based violation of section 337 can be found "only if an industry in the United States, relating to the articles protected by the patent . . . concerned, exists or is in the process of being established." 19 U.S.C. § 1337(a)(2).

a plurality of working channels extending between the two ends, each channel having a predetermined diameter and having an opening at each end;

a flexible, hollow tube having a longitudinal axis disposed in one of the working channels of the endoscope, the tube having a diameter which is less than the diameter of the channel through which it is inserted, the tube including:

a distal end and an opposing proximal end, each end of the tube having an opening, the tube having an inside and an outside,

the tube positioned within the endoscope such that a portion of the tube including the opening at the distal end of the tube protrudes beyond the opening at the distal end of the endoscope and such that a gas stream exits from the opening at the distal end of the tube in order to establish an inert gas atmosphere between the distal end of the tube and the region of the tissue to be coagulated, and

an electrode for ionizing the inert gas positioned inside the tube and offset from the opening at the distal end of the tube a predetermined minimum safety distance, such that the electrode can not come in contact with the tissue;

a source of pressurized ionizable, inert gas connected to the opening at the proximal end of the tube and pressurized such that a stream of gas flows from the source, through the tube and exits through the opening at the distal end of the tube at a low flow rate of less than about 1 liter/minute;

optical means positioned within a second working channel of the endoscope and protruding sufficiently from the opening at the distal end of the second channel of the endoscope to view the distal end of the tube and the tissue to be coagulated;

and the portion of the tube protruding from the distal end of the endoscope positioned such that the longitudinal axis of the tube is arranged sidewardly of the area of tissue to be coagulated.

'745 Patent col.11 ll.10–52 (emphases added). Claims 37, 38, 39, and 41 depend from

independent claim 35, which states:

35. A method for coagulating tissue during endoscopic surgery comprising the following steps:

providing a surgical endoscope, the endoscope having a proximal end, an opposing distal end, an opening at each end, and a plurality of working channels extending between the openings at each end, each channel having a predetermined diameter, the endoscope having a flexible, hollow tube having a longitudinal axis inserted through one of the working channels of the endoscope, the tube having a diameter which is less than the diameter of the channel through which it is inserted, the tube having a distal end, an opposing proximal end connected to a source of ionizable, inert gas, an opening at each end, a channel extending between the two ends, an inside, an outside; and an electrode, arranged stationarily inside the tube and being offset from the opening at the distal end of the tube a predetermined minimum safety distance in such a manner that the electrode can not come into contact with the tissue; the tube positioned within the working channel of the endoscope such that the opening at the distal end Of [sic] the tube protrudes beyond the opening at the distal end of the endoscope, and can be observed through optical means provided at or near the distal end of said endoscope;

supplying the inert gas from the source of said gas through the tube to the distal end opening of said tube with such a low flow rate, that gas exiting through said distal end opening is a not directed, non laminar stream but forms an inert gas atmosphere between the distal end of the tube and the region of the tissue to be coagulated, while the distal end opening is maintained at a distance from the tissue to be coagulated in which situation the area of tissue to be coagulated is positioned sidewardly of the extended longitudinal axis of the said protruding end portion of said tube;

ionizing said inert gas atmosphere by activating a high frequency voltage source connected to the electrode by establishing an electric field in the inert gas atmosphere between the electrode and the sidewardly arranged area of tissue to be coagulated; and

supplying an electric current by means of a plasma jet as a function of the direction of said electric field and the electric conductivity of the tissue surface to be coagulated, and coagulating an area of the tissue sidewardly of the extended longitudinal axis of the protruding end of the tube while the distal end opening of the tube is maintained in a substantially stationary position at a predetermined distance from the tissue to be coagulated, and while the ionized gas is being

> supplied through the distal end opening of the tube as a not directed, non laminar stream with a low flow rate.

'745 Patent col.15 l.25–col.16 l.14 (emphases added).

The probes at issue in this appeal are 1.5mm and 2.3mm probes manufactured by KLS Martin GmbH & Co. ("KLS Martin") and imported and sold by Canady. ERBE accused Canady of importing and selling the 1.5mm KLS Martin probes to North Carolina Baptist Hospital, which allegedly used endoscopes and Canady's probes in a way that directly infringed claims 1 and 35. Canady was accused of importing and selling the 2.3mm KLS Martin probes to the Cleveland Clinic Foundation, which allegedly used endoscopes and Canady's probes in a way that directly infringed claim 1. Canady was also accused of importing and selling the 2.3mm KLS Martin probes to the Mayo Clinic, MetroHealth General Hospital, Indiana University Hospital, and Georgetown University Hospital, all of which allegedly used endoscopes and Canady's probes in a way that directly infringed claim 35.

In addressing the issue of infringement, the Administrative Law Judge ("ALJ") construed the terms "working channel," "sidewardly," and "predetermined minimum safety distance." The ALJ construed "working channel" as "a channel through which a device that performs work may be inserted." In re Certain Endoscopic Probes for Use in Argon Plasma Coagulation Sys., Inv. No. 337-TA-569, slip. op. at 48 (Int'l Trade Comm'n Jan. 16, 2008) ("Initial Determination"), available at 2008 WL 274869 (public version). The ALJ construed "sidewardly" as "alongside." Id. at 42. The ALJ construed

> the limitation "an electrode . . . positioned inside the tube and offset from the opening at the distal end of the tube a predetermined minimum safety distance" of claim 1 and the limitation "an electrode, arranged . . . inside the tube and being offset from the opening at the distal end of the tube a predetermined minimum safety distance" of claim 35 as requiring the

electrode to be positioned inside the tube and offset from the opening at the distal end of the tube a predetermined distance that will not allow the electrode to contact tissue.

Id. at 40. In this construction, the ALJ limited "tube" such that "the tube and endpiece are separate and distinct elements." Id. at 37.

After a hearing, the ALJ found that ERBE presented no evidence that any of the institutions ever used either the 1.5mm or 2.3mm KLS Martin probes with a multiple "working channel" endoscope, as that term was construed by the ALJ. None of the accused probes was found to have an electrode which satisfied the "predetermined minimum safety distance" limitation. In addition, the ALJ found that ERBE presented no evidence that the 1.5mm KLS Martin probe was ever used sidewardly, and also presented no evidence that it was used at all. As there was no evidence of direct infringement of any of the asserted claims, the ALJ found no evidence of contributory infringement or induced infringement as to either the 1.5mm or 2.3mm KLS Martin probes. Based on testimony, the ALJ also found that (even assuming direct infringement) there was no contributory infringement as to the 1.5mm KLS Martin probes because coagulating tissue in a non-sidewardly manner was a substantial noninfringing use. Finally, the ALJ found that there was no domestic industry as required by 19 U.S.C. § 1337(a)(2) because ERBE presented no evidence that "any user of its APC system uses an endoscope with a plurality of working channels." Initial Determination at 83.

ERBE filed a petition for review of the ALJ's initial decision with the ITC, challenging the ALJ's findings as to infringement and the absence of a domestic industry. The ITC adopted the ALJ's findings in all respects, except for the ALJ's

construction and findings related to the term "predetermined minimum safety distance," and affirmed the ALJ's determination of no violation of section 337 by Canady.

ERBE timely appealed the ITC's findings of non-infringement and finding of no domestic industry. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(6).

DISCUSSION

We review the rulings of the ITC under the Administrative Procedure Act, 5 U.S.C. § 706. 19 U.S.C. § 1337(c); Osram GmbH v. Int'l Trade Comm'n, 505 F.3d 1351, 1355 (Fed. Cir. 2007). "Rulings of law by the ITC are reviewed for correctness, and findings of fact are reviewed to ascertain whether they were supported by substantial evidence on the record as a whole." Osram, 505 F.3d at 1355.

The parties agree that if we affirm the ITC's construction of "working channel," then the ITC's non-infringement determination was correct, and we need not reach the other issues raised in this appeal. This is so because the parties agree that the claims require more than one "working channel" (a "plurality") and that under the ITC's claim construction the endoscopes in question only had a single "working channel." Under that construction there would be no direct infringement and, consequently, no basis for a finding contributory or induced infringement.

The ITC and Canady argue that the claim construction of "working channel" by the ITC as "a channel through which a device that performs work may be inserted," was correct. In contrast, ERBE argues that "working channel" should be construed broadly "to mean 'a channel of an endoscope through which work is performed,' where 'work' includes visualization through an optical means, coagulation of tissue, irrigation, inflation, and suction." Appellants' Br. 15.

We note initially that ERBE's construction is overly broad insofar as it tends to treat channels dedicated exclusively to suction or gas delivery as "working channels." ERBE has conceded that a "working channel" must be an "instrument channel."[3] We think that under this construction, channels which perform only suction or only gas delivery are not working channels because such channels are not instrument channels. This is so even though the specification says that suction and gas delivery can be done within a "working channel." There is no suggestion that a channel which can perform only that one function is a working channel. See '745 Patent col.2 ll.62–67 ("[s]ince the working channel itself serves for the delivery of gas"); id. col.4 ll.51–54 ("in which working channel 7 serves as gas supply conduit 11"); id. col.10 ll.49–51 ("Continuous or interrupted suction through the second channel should be applied if using a double-channel therapeutic endoscope."). Thus, the fundamental disagreement between the parties boils down to whether fixed optics are a "working channel." ERBE presented evidence that the 2.3mm KLS Martin probes had been used with such a fixed optics endoscope.[4]

We review claim construction de novo. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). The claims "must be read in view of the specification, of which they are a part." Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting Markman v. Westview Instruments, Inc., 52 F.3d

---

[3] Appellants' Br. 34 ("The '745 specification uses the terms 'working channel' and 'instrument channel' interchangeably, which is consistent with the use of the terms by practitioners.").

[4] The ALJ also found that ERBE presented no evidence that the 1.5mm KLS Martin probes had ever been used. This finding is supported by substantial evidence.

967, 979 (Fed. Cir. 1995) (en banc)).  We generally do not construe claim language to be inconsistent with the clear language of the specification; "[u]sually, it is dispositive." Phillips, 415 F.3d at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

ERBE's contention that fixed optics constitute a "working channel" is inconsistent with the figures in the specification that show a fixed optics installation but do not label that installation as constituting a "working channel."  Figure 1 of the specification, reproduced below, shows an optical lens labeled 5, and two "working channels" labeled 6 and 7:



FIG.1

Figure 1 of the '745 Patent is described in the specification as:

> FIG. 1 shows a flexible endoscope known as such, which is provided with a device in accordance with the invention, which device comprises a tube out of PTFE or the like material. . . . The tube 2 protrudes out of the distal end of a <u>working channel 7</u>.  At the distal end of the endoscope <u>a lens 5 of a viewing optics</u> is provided.  Furthermore, the distal end of a <u>second working channel 6</u> can be seen.  The tube 2 is connected through a gas supply conduit 3 with a not shown gas reservoir which may be a gas cylinder filled with argon.

'745 Patent col.3 l.63–col.4 l.6 (emphases added).  Figure 1 thus shows two "working channels," which are distinct from the labeled lens of a viewing optics.  There is no ambiguity in this figure or in this description; fixed viewing optics are not in a "working channel."  The description and labeling of Figure 12, shown below, is similar:



The same embodiment of the invention is shown by Figures 1 and 12.  Id. col.3 ll.40–42.  Figure 12 of the '745 Patent is described in the specification as:

> In the embodiment shown in FIG. 12 the distal end of the tube 2 or of the attachment 11, respectively, may be tilted with respect to the exit direction, e.g. by providing flexible bellows 15 between the tube 2 [shown in unnumbered working channel 7] and the orifice 9, whereby the adjustment of the direction takes place by means of a manipulator 14, which simply may be rope 14, which rope extends through the second working channel 6 of the endoscope, so that the direction of the orifice 9 can be changed by pulling the rope at the end of the endoscope in the direction of the arrow.

Id. col.5 ll.21–31 (emphasis added).  Figure 12 shows two "working channels," 6 (labeled) and 7 (unlabeled), and neither includes fixed optical means.  Again, the optical means (labeled 5) are not described as part of or inside any of the "working channels."  Moreover, in Figure 12, though the "working channels" are shown extending through the

endoscope, the optical means are not similarly shown to be within any kind of channel. Nowhere does the specification indicate that a "working channel" can be a fixed optics installation.

The dictionary definition of "working" also supports the ITC's interpretation. Dictionaries are "among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." Phillips, 415 F.3d at 1318. The dictionary definition of the adjective "working" is "1: adequate to permit work to be done . . . 2: assumed or adopted to permit or facilitate further work or activity." Webster's Third New International Dictionary 2635 (Merriam-Webster 2002). The relevant dictionary definition of "work" is "activity in which one exerts strength or faculties to do or perform." Id. at 2634. This suggests that a "working channel" is not stationary (as with a fixed optics installation) but is a channel through which work or activity may be done during the procedure.

ERBE argues, however, that the language of claim 1 demonstrates that a fixed optics installation does in fact constitute a "working channel." We disagree. Claim 1 requires "optical means positioned within a second working channel of the endoscope." '745 Patent col.11 ll.44–45. Claim 1 also requires each "working channel" to have "an opening at each end" of the endoscope. Id. col.11 l.16. In light of the figures showing that a fixed optics installation is not a "working channel," claim 1 must be construed to refer to movable, not fixed, optics. The fact that the optics are described as "positioned" does not suggest that they are fixed rather than movable.

Contrary to ERBE's argument, the patent does contemplate a movable optics installation. The specification describes optical means within an instrument channel,

stating that the probe "can be seen well through a viewing lens at the distal end of the endoscope, which lens is associated with a viewing optics arranged in an instrument channel of the endoscope." Id. col.2 ll.41–45. The specification makes clear that an instrument channel is a channel in which surgical tools can be inserted during the procedure. Id. col.10 ll.29–33. There was also uncontroverted testimony in the record that movable optics were well-known and widely used at the time of the patent application as an alternative to fixed optics. The way to reconcile claim 1 with the specification is thus to construe claim 1 as referring to movable optics. In short, fixed optics do not involve a "working channel."

As noted above, the parties agree that infringement requires the accused devices to be used with an endoscope having at least two "working channels" and that the accused devices have only a single "working channel" if the fixed optics are not a "working channel." Based on our claim construction, the ITC correctly concluded that ERBE presented no evidence that any accused device had been used with an endoscope that had at least two "working channels" and, therefore, that there was no evidence of direct infringement and thus no basis for finding induced or contributory infringement. In light of this holding, we need not address the other arguments raised on appeal. Accordingly, we affirm.

<u>AFFIRMED</u>

COSTS

No costs.